In the

# United States Court of Appeals

## For the Seventh Circuit

_____

Nos. 19-3180 & 19-3183

ARMANDO CHAGOYA, *et al.*,

*Plaintiffs-Appellants,*

*and*

ROBERT BARTLETT, *et al.*,

*Plaintiffs-Appellants,*

*v.*

CITY OF CHICAGO,

*Defendant-Appellee.*

_____

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 18-cv-6468 & 14-cv-7225 — **Charles P. Kocoras**, *Judge.*

_____

ARGUED OCTOBER 28, 2020 — DECIDED MARCH 25, 2021

_____

Before RIPPLE, WOOD, and BRENNAN, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Current and former members of the
Chicago Police Department's Special Weapons and Tactics

("SWAT") Unit brought actions[1] on behalf of themselves and similarly situated SWAT operators[2] against their employer, the City of Chicago ("the City"). They alleged violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/1 et seq., and the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 et seq.

In their complaint, the operators related that when they take their SWAT equipment home, they must store some of that equipment inside their residences; it cannot be left in their vehicles. The operators sought compensation for the off-duty time required to transport, load, unload, and store their gear inside of their residences.

The City moved for summary judgment on all claims,

---

[1] This is a consolidated appeal of *Bartlett, et al. v. City of Chicago*, 14-cv-07225 (N.D. Ill.), and *Chagoya, et al. v. City of Chicago*, 18-cv-06468 (N.D. Ill.). The *Bartlett* plaintiffs filed suit on September 16, 2014, seeking compensation for time spent commuting between home and work, and time spent loading, unloading, and securing their equipment inside their homes. In 2018, the parties filed cross-motions for summary judgment. While the *Bartlett* summary judgment motions were pending, the *Chagoya* plaintiffs filed their complaint alleging identical claims on September 21, 2018. Due to the relatedness of the two cases, *Chagoya* was reassigned to the judge who had been presiding over the *Bartlett* litigation. On October 1, 2019, the district court granted summary judgment to the City on all of the plaintiffs' claims in *Bartlett*. Because *Chagoya* presented identical claims, the district court also entered an order terminating *Chagoya*.

[2] "Operators" is a term employed by the Chicago Police Department for police officers with the rank of patrolman who are members of the SWAT Unit. Throughout this opinion, we will refer to them as "operators" and as "officers."

and the operators filed cross-motions for summary judgment on the FLSA and IMWL claims. The district court granted summary judgment in favor of the City, and the operators filed a timely appeal.[3] We now hold that the district court correctly determined that the activity of transporting, loading and unloading equipment to and from residences, and securing equipment inside residences is not integral and indispensable to the operators' principal activity. We therefore affirm the judgments of the district court.

# I

## BACKGROUND

### A.

The plaintiffs are current and former officers assigned to the Chicago Police Department's SWAT Unit. The SWAT Unit became a full-time unit of the Chicago Police Department ("CPD") in 2005 and is based at the Homan Square facility on the west side of Chicago. The SWAT Unit consists of a Commanding Officer, an Assistant Commanding Officer, supervisors, operators, and support personnel. The Commanding Officer reports directly to the CPD's Deputy Chief of Special Functions. The SWAT Unit is organized into four squads of operators; each squad is supervised by at least one sergeant.

The SWAT Unit's mission is a special and dangerous one. It provides a tactical response to critical incidents beyond the capabilities of normal police response, such as hostage situa-

---

[3] The jurisdiction of the district court is premised on 28 U.S.C. §§ 1331, 1337, 1367. Our jurisdiction is secure under 28 U.S.C. § 1291.

tions, barricaded or suicidal subjects, sniper or active shooter situations, and terrorism-related incidents. SWAT operators therefore must carry specialized gear and weaponry. Their equipment includes ballistic entry vests, a radio, headset, gas mask, night-vision goggles, helmet, a Glock 9mm handgun, and an M4 carbine rifle. Some SWAT operators perform unique roles, such as sniper, breacher, or medic, and must carry additional gear to perform these duties.

The SWAT Unit maintains a rotation schedule. Two squads are assigned to work in the Special Operations Response Time ("SORT") cars, while the other two squads engage in training. Every two weeks, the squads switch assignments. While on a SORT-car cycle, an operator reports for duty at Homan Square at the beginning of the shift. Operators are first given fifteen minutes to transfer their weapons and gear into their assigned SORT car before reporting inside for roll call. Operators are also given at least fifteen minutes prior to the end of their shift to transfer and secure their weapons and gear out of their SORT cars. These transfers are considered "on the clock," and the officers are compensated for the time expended on this transfer.

In the event of a critical incident, on-duty SWAT operators are the first called to respond. If additional operators are needed, an off-duty call-out occurs. Off-duty operators are contacted by phone and email. If an operator is available and willing to respond, the operator responds to the call-out. As soon as an off-duty operator agrees to respond, the operator is considered "on duty" and is compensated starting from the time of the off-duty call-out. This compensation covers the time spent loading equipment stored in the operator's home to the operator's vehicle, traveling to the incident site,

traveling back to Homan Square after the incident is resolved, and attending a debriefing session at Homan Square. Operators are also given an additional ninety minutes to two hours of overtime compensation to organize and clean their gear and weapons.

For the first several years of the SWAT Unit's full-time existence, operators were not authorized to take their rifles home while off duty. Rather, they stored their rifles on a SWAT weapons truck, which was kept at the Homan Square facility. In late 2008 and early 2009, members of the SWAT Unit asked that operators be permitted to take their weapons home during off-duty hours. Post-incident reports in early 2009 stated that "SWAT operators responding from home are currently not allowed to transport their rifles with them," which "causes great delays in intelligence gathering and overwatch capabilities that is needed on all SWAT jobs."[4] Another memo indicated that SWAT operators responding from home in personal vehicles faced heavy rush-hour traffic, taking up to ninety minutes to respond. One proposed solution was to allow all SWAT operators to "have take-home cars with the ability to transport their rifles to and from work" as it "would reduce response time to a SWAT job to less than 60 minutes."[5] On March 16, 2009, the CPD issued Special Functions Group Unit Special Order 09-01, which authorized and directed SWAT operators "to transport their Department issued carbines and/or sniper rifles to and from home … to maintain a constant state of pre-

---

[4] R.193-5 at 2.

[5] *Id.*

paredness and the ability to readily respond to critical inci-
dents."[6] Special Order 09-01 prohibited operators who
transport their rifles from storing their rifles in a personal or
department vehicle at any time.

The parties dispute whether Special Order 09-01 *required*
SWAT operators to take their rifles home or whether they
still were allowed to keep their rifles at Homan Square. On
April 1, 2009, Lieutenant Mark Marianovich[7] sent out re-
vised Standard Operating Procedures, which "mandate[d]
that its members keep their equipment in a state of readiness
to respond quickly to a critical incident."[8] The Standard Op-
erating Procedures also detailed the off-hours vehicle use
policies and procedures. CPD assigned and issued some ve-
hicles for use beyond normal hours to give SWAT operators
the ability to respond to off-hours critical incidents. The goal
was for SWAT operators "to be able to respond to the scene
of a critical incident within one hour of the callout."[9] Addi-
tionally, the policy placed restrictions on the use of the de-
partment vehicle. For example, the vehicles were only to be
used for travel to and from work and for critical incident re-
sponse from home; they were not to be used for personal or
other family business. An April 2009 report observed that
"[a]lthough many operators were responding to the job in

---

[6] R.193-8 at 1.

[7] The appellate briefs refer to Mr. Marianovich as "Captain." In the text,
we use the rank at the time of his deposition, "Lieutenant."

[8] R.193-9 at 7.

[9] *Id.* at 15.

their personal vehicles, they responded to the scene with their rifles and equipment already in their possession."[10] Additionally, the operators "did not have to wait until the trucks arrived on scene in order to quickly deploy to their positions."[11]

In December 2010, CPD issued all SWAT operators take-home vehicles. Lieutenant Raymond Hamilton instruct-ed operators who were issued take-home vehicles to move their equipment kits and rifles to their assigned vehicles. With take-home vehicles, the operators were no longer au-thorized to store their personal equipment kits inside the equipment room or to leave their CPD rifles on the weapons truck unless the operator was on furlough or out of town. Sergeants had the responsibility to ensure strict adherence to these directives. Lieutenant Hamilton further reiterated that equipment must be secured and that weapons were never to be left in their vehicles while off duty.

If an operator wanted an exception to the prohibition against storing rifles on the weapons truck, the officer had to secure the permission of a lieutenant. Plaintiff Jesus Cano testified that Lieutenant Marianovich permitted him to store his rifle at Homan Square while off-duty because he had small children at home and did not have a safe in which to store his rifle. If Officer Cano responded to an off-duty call-out, he would meet the weapons truck at the incident site or first pick up his weapon directly from Homan Square. Lieutenant Tom Lamb testified that he was aware of officers

---

[10] R.193-11 at 1.

[11] *Id.*

who stored their equipment at Homan Square and of at least five operators who stored their rifles on the weapons truck that went to each call-out.

In March 2011, CPD headquarters recalled many department vehicles that it had assigned previously to SWAT officers, leaving the SWAT Unit with an insufficient number of vehicles to permit each officer to use one for commuting. This situation resurrected the issue of where operators relying on personal vehicles could store their gear and rifles. Lieutenant Lamb expressed concern that, without having their weapons and gear with them, operators would have to drive all the way to Homan Square to get their equipment before meeting at the incident site or would have to wait at the incident site until the weapons truck arrived with their rifles. On March 21, 2011, Lieutenant Lamb emailed the SWAT Unit:

> No equipment will be stored in the SWAT cage, cleaning room, or equipment room. Per SOP each operator must have their [sic] equipment with them [sic] in a state of readiness. If an operator has reasonable issues with rifle storage then they [sic] may meet with Lt. Marianovich to discuss options. Please ensure that all bags are moved out of the cleaning room.[12]

On May 2, 2016, Deputy Chief Steve Georgas reiterated the off-duty firearms and equipment policies. He stated that "[c]ontinuing past practice, SWAT members [we]re not re-

---

[12] R.193-18.

quired to store [their equipment] … in their personal resi-
dences," were not required to transport their equipment to
and from their personal residences and work, and storage
lockers at Homan Square were provided to store their
equipment while off duty.[13] Operators, however, who chose
to transport their rifles and SWAT gear home after their
shifts *were required* to unload their firearms, radio, and
night-vision goggles from their vehicles and store those
items inside their residences. All other SWAT equipment
could be left inside the locked vehicle, so long as the equip-
ment could not be seen from outside the vehicle. SWAT op-
erators stated that it took approximately fifteen minutes to
load and unload their gear and weapons from their vehicles
to their residences.

The operators believed that Deputy Chief Georgas's
memo was a "litigation tactic," and that the operators did
not actually have a "choice" of where to store their weapons
and equipment.[14] They therefore sent a memo on May 4,
2017, to Lieutenant Lamb informing him and the CPD of
their intention to "stor[e] their SWAT equipment, weapons
and gear in their lockers and on SWAT trucks at Homan
Square while off-duty."[15] The operators acknowledged,
however, that they could not possibly maintain the constant
state of readiness required of them if they stored their weap-
ons and equipment at Homan Square.

---

[13] R.181-9 at 2.

[14] R.194-8 at 1; R.188 at 2–5.

[15] R.194-8.

On May 26, 2017, the CPD issued each SWAT operator a take-home vehicle. On September 22, 2017, Lieutenant Lamb released a memo reiterating that an operator who accepts a Department vehicle must transport CPD-issued SWAT firearms and gear in the Department vehicle at the end of the shift. SWAT operators, however, were permitted to store SWAT equipment at Homan Square upon request, which would be considered on a case-by-case basis.

**B.**

On September 16, 2014, Officers Robert Bartlett and Patrick Leydon, individually and on behalf of similarly situated SWAT operators, filed a complaint against the City of Chicago. The complaint alleged violations of the FLSA, the IMWL, and the IWPCA. In their initial complaint, the *Bartlett* plaintiffs sought compensation for the time spent commuting between home and work in their personal vehicles because during that commute they were transporting SWAT equipment and were not permitted to leave their vehicles unattended or carry civilian passengers. The *Bartlett* plaintiffs later amended their complaint, adding an additional claim for time spent loading and unloading their equipment and securing their equipment inside their residences. Their final complaint added claims for time spent commuting in department-issued vehicles, as opposed to solely personal vehicles. On September 21, 2018, Armando Chagoya and twenty-two other SWAT operators filed a complaint alleging the same violations. Due to the relatedness of the two cases, *Chagoya* was reassigned to the judge presiding over the *Bartlett* litigation.

In *Bartlett*, the City moved for summary judgment on all three claims, and the operators moved for summary judg-

ment on the FLSA and IMWL claims. The City took the view that the off-duty driving and transportation of SWAT weapons and gear during normal commutes between home and work were not tasks integral and indispensable to the SWAT operators' principal activities. The City maintained that SWAT operators were permitted to store and have stored their SWAT equipment at Homan Square and, without taking their gear home, were still able to perform their principal activities. Finally, the City contended that there was no promise, agreement, or practice of compensating operators for the time spent during a normal commute or for loading and unloading equipment. On the FLSA and IMWL claims, the operators contended that transporting and storing their SWAT equipment while off duty was integral and indispensable to their ability to maintain "mission readiness" and directly respond to critical incidents. As such, carrying equipment from their residences to their vehicles was a compensable activity that marked the start of their workday. Under the continuous workday rule, they reasoned, the workday would extend to when they returned home and unloaded and secured equipment inside their residences.

The district court agreed with the City. It concluded that the time spent loading and transporting equipment between an operator's residence and vehicle was not compensable under the FLSA because it was "two steps removed" from the principal activity of responding to critical incidents.[16] Although requiring the operators to bring their rifles and equipment home in case of an off-duty call-out may have

---

[16] R.257 at 12.

"support[ed] the Plaintiffs' ability to respond to critical incidents," these activities were not "integral and indispensable" to the officers' principal activities.[17] In support of its view, the court pointed out "that SWAT operators have been able to perform off-duty critical response efforts without having their gear at home, meaning that such a practice is not indispensable."[18] Because "the transportation, loading/unloading, and storage of gear is not integral and indispensable to a SWAT operator's principal activity, … [t]he practical effect of granting the Plaintiffs' requested relief would be to compensate them for the time spent commuting to and from work."[19] Compensating the officers for this activity, the court further noted, would be contrary to the Portal-to-Portal Act, which explicitly excepted from compensation an employee's commute time. *See* 29 U.S.C. § 254(a).

The district court then turned to the operators' IWPCA claim. To prevail on this claim, the operators had to establish that they were owed compensation from the City under an employment agreement. To fulfill this requirement, the operators pointed to their employment agreement, which provided for overtime compensation. The City replied that the overtime compensation provision was limited to "approved overtime." The operators then relied upon, in the alternative, the City's requirement that the operators transport and store their SWAT equipment as the agreement that binds the City

---

[17] *Id.* at 12.

[18] *Id.* at 13.

[19] *Id.*

under the IWPCA. The City replied that there was no agreement between the parties that the operators would be compensated for the transportation and loading/unloading of equipment between their vehicles and residences. The City also noted that it consistently had denied the operators' requests for such overtime pay.

The district court held that "the record and the existence of this lawsuit clearly indicate[d that] the City did not agree to pay the Plaintiffs overtime for the transportation and storage of their gear," and granted summary judgment in favor of the City on the IWPCA claim.[20]

On October 1, 2019, the district court entered summary judgment for the City in *Bartlett*. Subsequently, it entered judgment in favor of the City in *Chagoya*. The parties timely filed a joint notice of appeal.

## II

## DISCUSSION

We review a district court's grant of summary judgment de novo. *Gill v. Scholz*, 962 F.3d 360, 363 (7th Cir. 2020). "Where, as here, both parties filed cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the motion was granted." *Id.* Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We begin with the operators' FLSA and IMWL

---

[20] *Id.* at 15.

claims, which we consider together.[21] We then will consider separately the operators' IWPCA claim.

## A.

The operators first contend that the off-duty time spent transporting, loading and unloading SWAT equipment to and from their vehicles, and securing SWAT equipment inside their residences is compensable time because these activities are integral and indispensable to carrying out their principal activities. Resolution of this issue requires that we construe and apply the provisions of the FLSA. The Supreme Court and the courts of appeals have interpreted the text of this statute on many occasions, and Congress has amended the text, at least partially because of that judicial interpretation. A brief examination of that judicial-legislative dialogue will be helpful to our analysis.

## 1.

The FLSA, enacted in 1938, established minimum wage and overtime compensation standards for hours worked in excess of forty hours in each workweek. 29 U.S.C. § 201 et seq. As the Supreme Court has noted, the legislative history indicates that "the prime purpose of the [FLSA] was to aid the unprotected, unorganized and lowest paid of the nation's working population" in recognition of the unequal bargaining power of these employees to secure a minimum

---

[21] Because the IMWL parallels the language of the FLSA, the parties agree that the same standard applies to the operators' claims under the FLSA and the IMWL. Accordingly, we analyze the FLSA and IMWL claims together. *See, e.g.*, *Urnikis-Negro v. Am. Fam. Prop. Servs.*, 616 F.3d 665, 672 n.3 (7th Cir. 2010).

subsistence wage. *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706–07 n.18 (1945). An employer who does not comply with the Act faces liability for backpay, liquidated damages, and attorney's fees. 29 U.S.C. §§ 215–16.

The original text of the FLSA left certain key provisions undefined; it did not define "work" or "workweek." The Supreme Court initially interpreted those terms broadly. In *Tennessee Coal, Iron & Railroad Co. v. Muscoda Local No. 123*, 321 U.S. 590 (1944), the Court defined "work" as "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." *Id.* at 598. Shortly afterward, the Supreme Court "clarified that 'exertion' was not … necessary for an activity to constitute 'work' under the FLSA," noting that an employer could hire an employee "to do nothing, or to do nothing but wait for something to happen." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 25 (2005) (quoting *Armour & Co. v. Wantock*, 323 U.S. 126, 133 (1944)). In *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946), the Court defined "the statutory workweek [as] all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace." *Id.* at 690–91. Thus, under this broad reading, the Supreme Court had held that "the time necessarily spent by the employees in walking to work on the employer's premises, following the punching of the time clocks," *Anderson*, 328 U.S. at 691, and that time spent by iron ore miners traveling underground in mines, *Tennessee Coal*, 321 U.S. at 598–99, constituted "work" for which employees were entitled compensation.

These holdings "provoked a flood of litigation," with "unions and employees fil[ing] more than 1,500 lawsuits under the FLSA," seeking almost a combined "$6 billion in backpay and liquidated damages for various preshift and postshift activities." *Integrity Staffing Sols., Inc. v. Busk*, 574 U.S. 27, 31–32 (2014). In response to the litigation that followed the Supreme Court's rulings, "a flood of anti-portal bills was introduced" in Congress. Marc Linder, *Class Struggle at the Door: The Origins of the Portal-to-Portal Act of 1947*, 39 Buff. L. Rev. 53, 133 (1991).

Congress determined that the Act "ha[d] been interpreted judicially in disregard of long-established customs, practices, and contracts between employers and employees, thereby creating wholly unexpected liabilities, immense in amount and retroactive in operation, upon employers," and declared the current situation an "emergency." 29 U.S.C. § 251. It concluded that, if the Court's interpretation of the Act were to stand, it "would bring about financial ruin of many employers and seriously impair the capital resources of many others," while allowing "employees [to] receive windfall payments, … for activities performed by them without any expectation of reward beyond that included in their agreed rates of pay." *Id.*

"Congress met this emergency with the Portal-to-Portal Act." *Integrity Staffing*, 574 U.S. at 32. The Portal-to-Portal Act amended the FLSA by creating two categories of work-related activities for which employers were not liable:

> (a) … [N]o employer shall be subject to any liability or punishment … on account of the failure of such employer to pay an employ-

ee minimum wages, or to pay an employee overtime compensation, for … —

(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

(2) activities which are preliminary to or postliminary to said principal activity or activities,

which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

29 U.S.C. § 254(a). Thus, ordinary commute times and pre-liminary and postliminary activities that occurred before or after the workday were no longer compensable activities under the FLSA.

Notably, the Portal-to-Portal Act left in place the continuous workday rule. Under this rule, "compensable time comprises 'the period between the commencement and completion on the same workday of an employee's principal activity or activities … [,] whether or not the employee engages in work throughout all of that period.'" *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 226 (2014) (quoting 12 Fed. Reg. 7658 (1947); 29 C.F.R. § 790.6(b) (2013)). The Department of Labor's interpretive statements confirm the continued vitali-

ty of this rule.[22] Those statements provide explicitly that the "[p]eriods of time between the commencement of the employee's first principal activity and the completion of his last principal activity on any workday must be included in the computation of hours worked"; such time is unaffected by the excepted categories created by the Portal-to-Portal Act. 29 C.F.R. § 790.6(a); *see* 29 U.S.C. § 254(a). Similarly, the interpretive statements define "workday" as "the period between the commencement and completion on the same

---

[22] The Department of Labor's interpretive statements relating to the Portal-to-Portal Act "are not promulgated regulations because Congress did not authorize the Secretary of Labor to issue regulations regarding the scope of the exemptions." *Bonilla v. Baker Concrete Constr., Inc.*, 487 F.3d 1340, 1343 (11th Cir. 2007); 29 C.F.R. § 790.1(c) ("[T]he interpretations set forth herein are intended to indicate the construction of the law which the Administration believes to be correct."). "As an interpretive regulation, it does not have the force of binding law." *Howard v. City of Springfield, Ill.*, 274 F.3d 1141, 1146 (7th Cir. 2001) (citing *Shaw v. Prentice Hall Comput. Publ'g, Inc.*, 151 F.3d 640, 642 (7th Cir. 1998)). The Department of Labor's interpretative statement, then, is "not entitled to deference, although courts may rely on it as persuasive evidence both of Congress's legislative and the Secretary's regulatory intent." *Id.*; *see also Gonzales v. Oregon*, 546 U.S. 243, 256 (2006) ("[T]he interpretation is 'entitled to respect' only to the extent it has the 'power to persuade.'" (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944))); *Skidmore*, 323 U.S. at 140 ("[R]ulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.").

workday of an employee's principal activity or activities." 29 C.F.R. § 790.6(b).

Congress again amended the Portal-to-Portal Act in 1996 with the Employment Commute Flexibility Act ("ECFA"). This enactment "clarifie[d] the applicability of the Portal-to-Portal Act to the payment of wages to employees who use employer-provided vehicles." *Chambers v. Sears Roebuck & Co.*, 428 F. App'x 400, 409 (5th Cir. 2011). The ECFA, in relevant part, states:

> [T]he use of an employer's vehicle for travel by an employee and activities performed by an employee which are incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee.

29 U.S.C. § 254(a).

Therefore, the FLSA, as amended, applies only to the employee's "principal activity." An employee's "principal activity" includes any activity "integral and indispensable" to the principal activity. A "principal activity" commences an employee's workday; once started, that "workday" continues until the conclusion of the employee's final principal activity of the day. The Act, however, does not apply to a worker's "preliminary activity" or "postliminary activity."

The dichotomy between "principal activity" on the one hand and "preliminary activity" or "postliminary activity" on the other is an important distinction for our analysis. Just as important, however, is a clear understanding of "principal activity." An employee's "principal activity" is the activity or activities which the employee is employed to perform. *Integrity Staffing*, 574 U.S. at 36; *see also* 29 C.F.R. § 790.8(a). The Department of Labor notes that "[t]he legislative history … indicates that Congress intended the words 'principal activities' to be construed liberally … to include any work of consequence performed for an employer, no matter when the work is performed." 29 C.F.R. § 790.8(a).

The Supreme Court consistently has interpreted "principal activity" to include all activities which are "integral and indispensable" to the principal activity. *Integrity Staffing*, 574 U.S. at 33; *IBP, Inc.*, 546 U.S. at 29–30; *Steiner v. Mitchell*, 350 U.S. 247, 252–53 (1956). This reading is consistent with the Department of Labor's interpretive statements. *See* 29 C.F.R. § 790.8(b) ("The term 'principal activities' includes all activities which are an integral part of a principal activity."); *id.* § 790.8(c) ("Among the activities included as an integral part of a principal activity are those closely related activities which are indispensable to its performance.").

In defining "integral and indispensable," the Supreme Court has interpreted "those words in their ordinary sense." *Integrity Staffing*, 574 U.S. at 33. "The word 'integral' means '[b]elonging to or making up an integral whole; constituent, component; *spec*[*ifically*] necessary to the completeness or integrity of the whole; forming an intrinsic portion or element, as distinguished from an adjunct or appendage.'" *Id.* (alterations in original) (quoting 5 Oxford English Dictionary

336 (1933)). The word "'indispensable' means a duty '[t]hat cannot be dispensed with, remitted, set aside, disregarded, or neglected.'" *Id.* (alteration in original) (quoting 5 Oxford English Dictionary 219). Thus, "[a]n activity is therefore integral and indispensable to the principal activities that an employee is employed to perform if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." *Id.*

By contrast, a "preliminary activity" is "an activity engaged in by an employee before the commencement of his 'principal' activity or activities." 29 C.F.R. § 790.7(b). Similarly, a "postliminary activity" is "an activity engaged in by an employee after the completion of his 'principal' activity or activities." *Id.* "[A]n activity which is a 'preliminary' or 'postliminary' activity under one set of circumstances may be a principal activity under other conditions." *Id.* § 790.7(h).

The cases and Department of Labor statements interpreting the Portal-to-Portal Act focus on the distinction between "principal activity" on the one hand, and "preliminary" and "postliminary" on the other. By doing so, they help illustrate the meaning of "integral and indispensable," which, as we have seen, is the important descriptive phrase in our understanding of "principal activity." We therefore will review these authorities before returning to the facts of the case before us.

We begin with *Steiner v. Mitchell*, 350 U.S. at 247. There, the Supreme Court held that the time spent by battery-plant employees "changing clothes at the beginning of the shift and showering at the end, where they must make extensive use of dangerously caustic and toxic materials," was integral and indispensable to the employees' principal activity. *Id.* at

248. In *Mitchell v. King Packing Co.*, 350 U.S. 260 (1956), the Court held that "the knife-sharpening activities of [meat-packer employees] [we]re an integral part of and indispensable to the various butchering activities for which they were principally employed." *Id.* at 263. The activity was integral and indispensable because "a dull knife would slow down production which is conducted on an assembly line basis, affect the appearance of the meat as well as the quality of the hides, cause waste and make for accidents." *Id.* at 262.

By contrast, in *IBP, Inc.*, 546 U.S. at 21, the Court held that the time spent by meat processing plant employees *waiting* to don protective gear was not compensable under the FLSA because it was "two steps removed from the productive activity on the assembly line." 546 U.S.at 42. The Court contrasted pre-donning waiting time from the actual activity of donning certain protective gear "which is *always* essential if the worker is to do his job." *Id.* at 40. "[T]he fact that certain preshift activities are necessary for employees to engage in their principal activities does not mean that those preshift activities are 'integral and indispensable' to a 'principal activity.'" *Id.* To characterize as "integral and indispensable" activities that were merely necessary would leave "no limiting principle" and lead "to the logical (but untenable) conclusion that the walking time at issue in *Anderson* would be a 'principal activity.'" *Id.* at 41. Such conclusion, however, was the judicial interpretation squarely rejected by Congress when it passed the Portal-to-Portal Act.[23]

---

[23] Following the Supreme Court's decision in *IBP, Inc. v. Alvarez*, 546 U.S. 21 (2005), the Department of Labor issued Wage and Hour Advisory Memorandum No. 2006-2 on May 31, 2006, reiterating that

(continued … )

In *Integrity Staffing*, 574 U.S. at 27, the Court reiterated that "[t]he integral and indispensable test is tied to the productive work that the employee is *employed to perform*." 574 U.S. at 36. There, employees sought compensation for the time spent undergoing post-shift security screenings before leaving the workplace. The principal activity of the employees, however, was to "retrieve products from warehouse shelves and package those products for shipment to Amazon customers." *Id.* at 35. The employees were not hired "to undergo security screenings" and "[t]he screenings were not an intrinsic element of retrieving products from warehouse shelves or packaging them for shipment." *Id.* Further, "Integrity Staffing could have eliminated the screenings altogether without impairing the employees' ability to complete their work." *Id.*

The Department of Labor offers two more examples of activities considered integral and indispensable, and therefore principal activities:

---

( … continued)

> … donning and doffing of required gear is within the continuous workday only when the employer or the nature of the job mandates that it take place on the employer's premises. It is our longstanding position that if employees have the option and the ability to change into the required gear at home, changing into that gear is not a principal activity, even when it takes place at the plant.

*Id.* at 3; *see also Stuntz v. Lion Elastomers*, 826 F. App'x 391, 401 (5th Cir. 2020) (affirming the district court's determination that time spent donning and doffing generic PPE was not integral or indispensable, as "employees admitted their option of either taking the PPE home or leaving them at the facility").

(1) In connection with the operation of a lathe an employee will frequently at the commencement of his workday oil, grease or clean his machine, or install a new cutting tool. Such activities are an integral part of the principal activity, and are included within such term.

(2) In the case of a garment worker in a textile mill, who is required to report 30 minutes before other employees report to commence their principal activities, and who during such 30 minutes distributes clothing or parts of clothing at the workbenches of other employees and gets machines in readiness for operation by other employees, such activities are among the principal activities of such employee.

29 C.F.R. § 790.8(b)(1)–(2). The Department of Labor also provides an example of when an activity might be integral and indispensable in one context, but not in another:

If an employee in a chemical plant, for example, cannot perform his principal activities without putting on certain clothes, changing clothes on the employer's premises at the beginning and end of the workday would be an integral part of the employee's principal activity. On the other hand, if changing clothes is merely a convenience to the employee and not directly related to his principal activities, it would be considered a "preliminary" or "post-

liminary" activity rather than a principal part
of the activity.

*Id.* § 790.8(c) (footnotes omitted).

With these authorities in mind, we now turn to the case before us.

**2.**

**a.**

The operators submit that the district court should not have granted summary judgment because a factual dispute remains as to whether SWAT operators must take their gear home in order to perform their principal activity of providing a tactical response to high-risk critical incidents. In their view, the district court ignored significant evidence that bringing their gear home was essential to providing the rapid response necessary to the unit's mission. It was error, they urge, for the district court to reach this conclusion by relying on the one exception where an individual officer was permitted to store his M4 rifle at Homan Square because he could not provide safe storage at home.

The City points out that there is evidence in the record that the CPD has allowed officers to store weapons at Homan Square at various times. Even after 2017 when the CPD made vehicles available to all the operators, officers received permission to leave weapons at Homan Square. The City maintains, however, that the general expectation is that members of the SWAT Unit will take their gear home.

It is not at all clear that there is an issue of fact separating the parties about the policy or the practice of the CPD. In any event, any such disagreement is hardly material to the

resolution of the dispute in this case. In *Integrity Staffing*, where security screenings were held to be postliminary to the principal activity of retrieving and packaging products, the Supreme Court held that the court of appeals had "erred by focusing on whether an employer *required* a particular activity." *Integrity Staffing*, 574 U.S. at 36. The Court clarified that "[t]he integral and indispensable test is tied to the productive work that the employee is *employed to perform*." *Id.* To focus merely on whether the employer required an activity "would sweep into 'principal activities' the very activities that the Portal-to-Portal Act was designed to address." *Id.* Even assuming a factual dispute, the "integral and indispensable" test does not turn on whether an employer required a particular activity. As we explain further below, even if the operators could prove these activities were fully required, their position still fails. Therefore, whether SWAT operators were *required* to transport and store their equipment in their residences is not a *material* dispute and does not preclude summary judgment.

### b.

We next examine the position of the operators. In essence, the operators maintain that bringing their weapons and equipment home, removing much of it from their vehicles, and storing securely the removed portion in their homes is an integral and indispensable part of their principal activity. They define that principal activity as responding rapidly and systematically to critical incidents. In their view, their workday begins when they begin to load their weapons and gear in the CPD car at their home and ends when they have secured that property in their home upon return. Noting that the district court relied in part on the decision of the

Ninth Circuit in *Balestrieri v. Menlo Park Fire Protection District*, 800 F.3d 1094 (9th Cir. 2015), they take significant care in attempting to distinguish that case from their own.

In *Balestrieri*, the Ninth Circuit considered whether firefighters were entitled to overtime compensation for the time spent loading and unloading their gear from their permanent to temporary duty stations while they were in an off-duty status. The court held that this time was not compensable under the FLSA because it was "two steps removed" from the firefighters' principal activity of fire suppression. Because the loading and transporting of gear was a "preliminary" activity and "not intrinsic to" fire suppression, it was not "integral and indispensable." Here, the district court concluded that the off-duty loading and transportation of SWAT equipment was similarly "two steps removed" from the principal activity of critical incident response.

The operators submit that the district court's reliance on *Balestrieri* was misplaced because (1) the principal activities and requirements of SWAT operators are not sufficiently similar to those of the firefighters and (2) the gear at issue was simply not comparable.[24] The operators maintain that they cannot perform their principal activity of responding to critical incidents if they leave their equipment at work. They point to the goals and mission of the SWAT unit, the expectations that operators respond within an hour of call-out, and the continued emphasis on maintaining a state of readiness. In their view, taking their equipment home is integral

---

[24] Appellant's Br. 14–18.

and indispensable to maintaining a state of readiness and responding within one hour of a call-out.

In assessing the operators' view, we turn first to the time spent by the operators in their CPD vehicles driving to and from their duty station for their regular work shifts. We have little difficulty in concluding that this time is not, standing alone, compensable. The 1996 amendments to the Portal-to-Portal Act through the ECFA make it clear that commuting time in an employer-provided vehicle is not compensable under the FLSA. This rule is not rendered nugatory simply because, as here, the employee carried supplies and equipment related to the employer's business. Nor does the analysis change simply because the employer places certain restrictions on the use of the vehicle.

The Eleventh Circuit arrived at a similar conclusion in *Llorca v. Sheriff, Collier County, Florida*, 893 F.3d 1319 (11th Cir. 2018). There, the court held that sheriff deputies' commute time—during which they were required to monitor the radio and observe and enforce traffic violations—was not an indispensable activity because the requirement to monitor "could be dispensed with without affecting at all the deputies' performance of their law enforcement duties during their shifts." *Id.* at 1328. Even if abolition of these in-transit duties had the effect of undermining law enforcement generally, the Eleventh Circuit concluded that the deputies "could fully perform their law enforcement duties during their shifts even if the sheriffs did not require them to engage in traffic law enforcement during their commutes." *Id.*

We agree that *Balestrieri* and *Llorca* support the district court's view of this case. However, even in the absence of these supportive cases from our sister circuits, we still would

conclude that applicable Supreme Court precedent and consonant Department of Labor interpretive statements require the conclusion that the off-duty transportation, loading and unloading, and storage of SWAT equipment simply is not integral and indispensable to SWAT operators' principal activities. Certainly, as the operators maintain, the record supports the assertion that the SWAT unit must respond quickly in the event of a call-out. The record does not support the conclusion, however, that the operators could not perform their principal duties without bringing their equipment home. SWAT operators may be able to perform their jobs *better* if they bring their weapons and other gear home, but as they had prior to 2009, SWAT operators still are able to perform their principal activities if they do not bring their equipment home but rely on other arrangements. Indeed, the record establishes that the officers who were unable to store their rifles at home would pick up their weapons from the weapons truck when it arrived on site. An activity that allows a reduced response time is an activity that promotes greater efficiency, but greater efficiency alone does not turn an activity into an integral and indispensable one.

The expectation that the operators will respond to emergency situations that occur while in transit is not an obligation in any way tied to their status as SWAT operators or to their use of a CPD vehicle. These are obligations undertaken by all off-duty CPD officers by virtue of the position of trust that they hold. In the same vein, the restrictions imposed on their use of CPD vehicles do not have even the most remote relationship to the principal activity of the operators. The CPD, like any employer who loans valuable property to an employee, has the right to impose reasonable restrictions on its use while it is in the custody of the employee. The City

has every right to limit its liability exposure and to guard against excessive depreciation of its assets.

The CPD requirement that certain equipment not be left in the vehicle but stored in the residence is nothing more than a reasonable directive that its officers take the precautions necessary to ensure the safe and secure storage of the weapons and equipment. This activity is very far removed, both logically and practically, from the operators' principal activity of handling critical incidents. It is simply designed to protect the public and ensure that Chicago-owned dangerous equipment is not used abusively.

The record firmly establishes that the activities for which the operators seek compensation are not integral and indispensable, but rather preliminary and postliminary activities to the workday, and explicitly excluded in the Portal-to-Portal Act.[25] Thus, the continuous workday rule is in-

---

[25] The operators also contend that the district court failed to consider a number of relevant cases. These cases are distinguishable because the pre- or post-commute tasks at issue were found to be integral and indispensable to the principal activity.

In *Graham v. City of Chicago*, 828 F. Supp. 576 (N.D. Ill. 1993), canine police officers who were required to board dogs at home, sought compensation for the time spent transporting the dogs to and from work. The court held that such time was compensable, as it was integral and indispensable to the officers' principal duties. Before transporting the dogs, "the officers must feed the animals and prepare them for the day's work," which the court found "clearly integral to their principal duties." *Id*. at 582. Similarly, transporting the dogs from work to home was "not postliminary because the principal activities [were] still ongoing: the dogs must still be fed and exercised." *Id.* For an employee's commute time to be considered compensable, the court must first find that the ac-

(continued … )

applicable here.

## B.

We now turn to the operators' remaining state-law claim. The Illinois Wage Payment and Collection Act "provides employees with a cause of action against employers for the timely and complete payment of earned wages." *Enger v. Chi. Carriage Cab Corp.*, 812 F.3d 565, 568 (7th Cir. 2016) (citing 820 ILCS 115/3). The IWPCA defines "wages" as "compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties." 820 ILCS 115/2. To state a claim under the IWPCA, employees are "required to demonstrate that they are owed compensation from defendants pursuant to an employment agreement." *Enger*, 812 F.3d at 568; *see also Brown v. Lululemon Athletica, Inc.*, No. 10-cv-05672, 2011 WL 741254, at *3 (N.D. Ill. Feb. 24, 2011) ("It is well established that an em-

---

( … continued)

tivities done before or after the commute were integral and indispensable.

The court in *Pizano v. Big Top & Party Rentals, LLC*, No. 15-cv-11190, 2017 WL 1344526 (N.D. Ill. Apr. 12, 2017), did conclude that ride time could be compensable under the FLSA, but the court did not determine if compensation was actually warranted. The order the operators cite to, however, did not decide the case—a factual issue remained, and discovery had not yet begun. The court stated that "[a]ssuming that Plaintiff establishes that he performed such tasks and that these tasks are integral and indispensable to Defendants' principal activity," then the travel time would be compensable under the continuous workday rule. *Id.* at *5. Still, *Pizano* does not support the operators' case here if the loading and unloading of equipment are held to be only preliminary and postliminary activities.

ployee can have no claim under the IWPCA unless the employer and employee agreed that the former would compensate the latter for the particular work allegedly performed.").

Such an "employment agreement need not be a formally negotiated contract." *Landers-Scelfo v. Corp. Off. Sys., Inc.*, 827 N.E.2d 1051, 1059 (Ill. App. Ct. 2005). A plaintiff "does not need to plead all contract elements if she can plead facts showing mutual assent to terms that support the recovery." *Id.* The IWPCA, however, "provides no substantive relief beyond what the underlying employment contract requires." *Enger*, 812 F.3d at 570; *see also Wharton v. Comcast Corp.*, 912 F. Supp. 2d 655, 658 (N.D. Ill. 2012) ("The IWPCA therefore does not provide an independent right to payment of wages and benefits; instead, it only enforces the terms of an existing contract or agreement."). Thus, the IWPCA holds the employer only to its promise under the employment agreement. *Enger*, 812 F.3d at 570.

The Collective Bargaining Agreement between the City and Chicago police officers provides that "[a]ll approved overtime in excess of the hours required of an officer by reason of the officer's regular duty, whether of an emergency nature or of a non-emergency nature, shall be compensated for at the rate of time-and-one-half."[26] According to the operators, the City effectively "pre-authorized and pre-approved" them to work overtime by requiring them to transport, load and unload, and secure their SWAT equipment while off duty.[27] Moreover, the operators continue, be-

---

[26] R.185-1 at 41; R.185-2 at 30–31.

[27] Appellant's Br. 8, 26–28.

cause the City gives the operators on-the-clock time to transfer the equipment from their take-home vehicle upon arrival at work and to transfer it again at the end of the shift, "the City has determined it is compensable work."[28] The City, however, maintains that there was no such agreement, "either by written contract or by their actions," that the operators' compensable work included their commute time, the loading and unloading of equipment from their vehicles to their residences, and the securing of that equipment inside their residences.[29]

We start our evaluation of this argument by noting that there is nothing in the Collective Bargaining Agreement—or the record—to establish the existence of an express agreement between the parties that the City would compensate the operators for the off-duty time spent transporting, unloading, and securing their equipment inside their residences. It is not enough to allege "the existence of *any* employment contract or agreement": the operators must "alleg[e] the existence of a contract or agreement that specifically gives [the Operators] a right to the wages [they] seek[]." *Dominguez v. Micro Ctr. Sales Corp.*, No. 11-cv-8202, 2012 WL 1719793, at *1 (N.D. Ill. May 15, 2012) (dismissing IWPCA claim for failure to allege specific agreement beyond general employment contract).[30] However, as the operators submit,

---

[28] *Id.* at 27.

[29] Appellee's Br. 39.

[30] *See also, e.g.*, *Grant v. Bd. of Educ. of City of Chi.*, 668 N.E.2d 1188, 1196 (Ill. App. Ct. 1996) (rejecting IWPCA claim because collective bargaining agreement did not require the payment of accumulated unused sick

(continued … )

express agreements are not required in IWPCA cases. An agreement "can be entirely implicit." *Landers-Scelfo*, 827 N.E.2d at 1058. Indeed, an employer's acquiescence or the existence of a custom or practice may constitute an agreement to compensate for such activities. *See Blakes v. Ill. Bell Tel. Co.*, 77 F. Supp. 3d 776, 781–82 (N.D. Ill. 2015).

Here, the record is also devoid of any implicit agreement between the parties or of any acquiescence by the City that operators would be compensated for the activities at issue. Several operators stated that they were unaware of any agreement that the City had an obligation to pay the operators for the time at issue. The evidence of a custom or practice is even weaker. Indeed, several operators first submitted overtime slips in March and April 2016 for the time spent transporting, loading and unloading, and securing their equipment in their residences. Other operators admitted that they never submitted overtime slips until March 2016 because they knew their slips would be denied. And in May 2016, the City denied the overtime slips submitted for such activities. The officers contend that "[t]he fact that the City never paid Plaintiffs for their uncompensated work or denied Plaintiffs' requests to be paid for said work does not prove that there was no agreement to [pay] for said work."[31] However, without any other evidence in the record beyond personal convictions that they should have been paid, the

---

( … continued)

leave); *Brand v. Comcast Corp.*, No. 12-cv-1122, 2013 WL 1499008, at \*6 (N.D. Ill. Apr. 11, 2013) ("It is not sufficient for an IWPCA claimant to allude to a 'policy' to pay overtime.").

[31] Appellant's Br. 28.

operators have failed to demonstrate a genuine dispute of material fact to survive summary judgment.

## Conclusion

The off-duty activities of transporting, loading and unloading, and storing SWAT equipment are too removed from the operators' principal activity of responding to critical incidents. Additionally, there was no agreement—explicit or implicit—between the parties that the City would provide overtime compensation for such activities. Accordingly, the judgments of the district court are affirmed.

AFFIRMED